IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff-Respondent,

v.                                                   CIV 98-1236 JP/KBM
                                                        CR 95-636 JP

FERNANDEZ SANDOVAL,

    Defendant-Movant

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

This matter is before the Court on Fernandez Sandoval's Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody pursuant to 28 U.S.C. § 2255. *Doc. 1.* The matter was originally referred to Magistrate Judge Joe H. Galvan. He appointed the Federal Public Defender to represent Sandoval, *Doc. 8,* and held an evidentiary hearing, *see Doc. 19.* The case was referred to me on December 19, 2000. *Doc. 32.* Having considered the record, relevant law, and being otherwise fully advised, I find the motion without merit and recommend that it be denied.

### I. Background

*Trial*

Sandoval and his co-defendant, Robert Gerold, were indicted for two separate armed bank robberies under 18 U.S.C. § 2113, and using or carrying firearms during those robberies under 18 U.S.C. § 924. Sandoval, who had prior felony convictions, was also charged with being a felon-in-possession of a Glock firearm that was not acquired by Sandoval until *after* the commission of

the two robberies in question. At trial, Sandoval was convicted on all counts.

Sandoval contends that he was denied effective assistance of counsel on four grounds: (1) counsel's failure to seek severance of the felon-in-possession count; (2) counsel's failure to investigate and present exculpatory evidence; (3) counsel's decision to inform the jury of Sandoval's prior bad acts and prior convictions; and (4) counsel's failure to object to testimony concerning prior convictions. In order to fully analyze these claims of ineffectiveness, the Court must view them not in isolation, but in the context of the defense as a whole. Most importantly in this case, counsel's strategy must be examined in the light of Defendant's "shifting" versions of events.

After Sandoval's first attorney, Roberto Albertorio, was permitted to withdraw, Chief Judge James A. Parker appointed Serapio Jaramillo to represent Defendant. Mr. Jaramillo testified at the March 24, 1999 evidentiary hearing in this matter about his trial preparation and strategy.[1] Mr. Jaramillo testified that when he first took over the case, Defendant claimed not to have committed the robberies and maintained his innocence. *TR* at 65, 78. Indeed, Sandoval's quarrel with his first attorney was that the attorney had not interviewed witnesses that could verify his "alibi." *Id.* at 77.

Trial was scheduled to begin Monday, August 5, 1996 with jury selection and presentation of evidence later in the week. *See Doc. 7, Exh. 3; CR 95-636 (Docs. 67, 72).* Chief Judge Parker held a hearing on Sandoval's motion to suppress photographic identification evidence on the Thursday prior to trial. After listening to the government witnesses at this hearing identify him as

---

[1] Sandoval was present at the evidentiary hearing and did not testify. *Transcript of March 24, 1999 Evidentiary Hearing* at 3 (hereinafter "*TR*").

one of the robbers, Sandoval became concerned he would be found guilty. It was only then that Sandoval told his attorney, "I've been lying to you this whole time. I lied to [my first attorney] as well. I really did commit the robberies." *See TR* at 65, 78-79. It should be noted that Sandoval mentioned nothing at this time about using toy guns.

The next day, Sandoval reached a plea agreement ("Agreement") with the Government. The Agreement called for Sandoval to plead guilty to, among other crimes, using or carrying a firearm in commission of a robbery in violation of 18 U.S.C. § 924(c). Mr. Jaramillo testified that he had earlier informed his client that unlike the elements of a § 2113 bank robbery offense,[2] § 924(c) required proof that real guns were used or carried. *See id.* at 80, 92-93. Sandoval was scheduled to enter his guilty plea the following Monday just before jury selection. *Doc. 7, Exh. 3; CR 95-636 (Docs 73); TR* at 67.

During the intervening weekend, however, Sandoval told his lawyer that he had been "lying . . . in another regard also" – that the guns used during the robbery were toy guns painted to look real. *TR* at 94*; see also id.* at 65-66, 80-81. The defendant had been aware for some time that certain witnesses to the robbery were expected to testify that they believed the guns used by Sandoval and Gerold appeared fake. Yet it was only on the eve of his anticipated guilty plea that he provided this second revelation of deception.

Mr. Jaramillo consequently informed the Court that a guilty plea could not be entered because there was an insufficient factual basis for the § 924(c) charge. *Id.* at 66-67, 95. Accordingly, plans for a negotiated resolution were abandoned, and Mr. Jaramillo requested

---

[2] *See e.g., United States v. Spedalieri*, 910 F.2d 707, 709-10 (10th Cir. 1990) (a fake bomb can satisfy § 2113's "dangerous weapon" element of armed robbery when "victim confronted is placed in reasonable expectation of danger").

3

additional time to investigate his client's newest version of events.  Chief Judge Parker granted counsel an additional week to prepare for trial.  *Id.* at 67-68, 94-95; *CR 95-636 (Doc. 73).*

Thus, Mr. Jaramillo was given just one week to ponder Defendant's newest account of the robberies.  Sandoval asserted that he, Gerold and another unidentified male coated plastic toy guns with black paint.  Sandoval indicated that his girlfriend, Tammy Martinez, though not present while they did this, was aware they had done so.  *See id.* at 82, 84-85.  Sandoval did not indicate that she had any involvement other than knowing they had been painted.  For example, he did not say that she bought the guns.  Sandoval did not give any dates as to the purchase of the toy guns or any basis for believing that the toy guns could be located.  *Id.* at 95-96.  Furthermore, he could not tell his attorney where to find Ms. Martinez or provide the name, address, or telephone number of the other male – only a general location of where he may have been living.  *Id.* at 85-86.

One month before trial, Tammy Martinez, who also happens to be co-defendant Gerold's sister, had been interviewed by Agent Samuel Macaluso.  According to his report, Martinez said she "had no information regarding the robberies," did not want to see Sandoval again, had "no intention" of appearing at  trial, and had "no interest in this case."  Mr. Jaramillo did not try to contact Ms. Martinez prior to trial because he and Sandoval did not know where to find her.[3]  *Id.* at 72.  Moreover, counsel's testimony suggested that any effort to contact her would have been fruitless, because Sandoval told him that Ms. Martinez' mother

> blamed him for Tammy's lifestyle . . . to say the least, he was not in

---

[3] Agent Macaluso's report had noted an address and telephone number for Ms. Martinez. *Id.* at 132 & Exh. 3.  Mr. Jaramillo could not recall, however, whether he was aware of Agent Macaluso's report before trial.  *Id.* at 71, 73. 74.

4

>good favor with the family. [Sandoval said] that the family would prevent me from contacting Tammy or from interviewing her or involving her in the case in any way."

*Id.* at 72.

Counsel attempted to hire investigators but they could not accommodate him on such short notice. Mr. Jaramillo himself tried to locate the other male, but was unsuccessful. *Id.* at 68. He did interview Gerold, who told him that the guns used by both during the robberies were in fact real. *Id.* at 83.

Given all of the above, the defense's greatest concern was a conviction on the second § 924(c) count which would carry a twenty-year term of incarceration. *Id.* at 93. Thus, Mr. Jaramillo's strategy was to be candid with the jurors concerning the robberies and Sandoval's prior convictions and contest only whether the guns used in the robbery were real firearms. Counsel believed it was likely that Sandoval would testify at the trial. Because Sandoval kept changing his story, not only by his revelations of deceit but also during the course of other interviews, *see id.* at 87, Mr. Jaramillo wanted to garner as much credibility as possible for Sandoval's most recent version, particularly should Sandoval elect to testify.

>One of the things that I thought to do was to get Mr. Sandoval committed to a version of facts that would not let him get any wiggle room after the jury knew about the facts. It didn't matter what version of the facts Mr. Sandoval gave, he always had a new version of the facts. He always had a changed version of the facts. He was always evolving the facts to be some version that he thought at the time, maybe just at the spur of the moment, thought helped him. . . .
>
>One of the things that I told him was that, if we're going to make any kind of headway with getting the jury to believe a version of the facts, you can't try to wiggle out of them once they're in. And once we make any kind of headway with the jury, if you then

5

come in and testify – because we were going to try to make our headway with the jury during the presentation of the Government's case, and that is specifically through the tellers and specifically through the witnesses that the Government put on to show that there was a very good likelihood sufficient to raise a reasonable doubt that the guns were actually real.

So whenever Mr. Sandoval testified, I didn't want him to have any kind of wiggle room from which the jury could – might perceive that he's lying or trying to cast the facts in his favor because then any kind of headway that we might have made with the actual government witnesses that were supposedly against him would then be lost. . . .

[H]e always tried to make the facts look better for him so that, if he took the stand, I really had no confidence that he wouldn't try to shift the facts unless we tied him down to a version that would not permit him to shift the facts. And that was to get as much credibility with the jury as we could by admitting the things that we thought the Government could prove anyway. . . .

We told them this is what he's done. He's taken his punishment for that. He's already been punished before for what he did. Punish him now for what he's done now before you, but don't punish him for something that he didn't do. We thought that was a better position to try and gain credibility with the jury than have Mr. Sandoval come in with his testimony afterwards and say something like 'I've never done anything like this before.' I didn't have any confidence that he wouldn't saying (sic) something like that.

And then the Government could come in on rebuttal and say, 'You've testified that you didn't do anything like this before. But as a matter of fact, you committed an other the (sic) robbery with a firearm, didn't you?' And that would be impeaching to him, and that would cause us to lose whatever ground that we had made up by just admitting to it, getting it out in front of the jury, and trying to gain credibility with them by laying him bare and saying 'Punish me for what I did. I stand before you ready to take my punishment, but please don't punish me for something that I didn't do.'

And the something that he didn't do is use real guns. And

6

>the way that we know that is because three different tellers said it at
>the time when the incident happened. I thought that was very
>powerful. I thought that it was sufficient to raise a reasonable
>doubt.

*Id.* at 46-50; *see also id.* at 63-64, 87. Although counsel acknowledged the potential for prejudice to a defendant when jurors are told of a defendant's prior convictions, *see id.* at 39-40, 53-54, and 87-88, Sandoval agreed with this strategy under the circumstances, *id.* at 41-46.

Counsel previewed his "full disclosure" strategy for the jurors in his opening statement by mentioning, without elaboration, that Sandoval had a prior conviction in 1989 for robbery, a prior conviction in 1991 for another crime, and that he committed another robbery in 1995, which was uncharged. *Id.* at 48, 51, 59; *see also Doc. 29* at 13. When a probation officer testified during the government's case-in-chief that the prior convictions were for armed robbery and false imprisonment with a firearm enhancement, Chief Judge Parker inquired why this was introduced by testimony rather than by stipulation. Mr. Jaramillo explained that he raised the issue in opening statement and was relying on a strategy of full candor. *Doc. 29* at 13-14.

Mr. Jaramillo eventually advised Sandoval not to take the stand because he believed the "headway" they made with the tellers' testimony might be lost if he testified. Sandoval followed this advice and did not take the stand. *TR* at 89. The jury convicted him of all counts and ultimately he was sentenced to 370 months incarceration on January 2, 1997. *See CR 95-636 (Docs. 83, 87, 105, 107).*

### *Post-Trial*

Sandoval's family hired Leonard Foster to pursue an appeal. *TR* at 113-115. On October 2, 1997, the Tenth Circuit rejected his arguments and affirmed the conviction and

7

sentence. *United States v. Sandoval,* 125 F.3d 864, 1997 WL 606882 (10th Cir. 1997). Among other things, the panel found that while use of a fake gun is not sufficient to support a conviction under § 924(c), some of the tellers testified that they believed that the guns carried by the robbers to be real. *Id.* at *2. The Court refused to review the claim that the trial court erred in allowing the parole officer's testimony, finding the issue waived by counsel informing the jury of Sandoval's prior convictions pursuant to its "candor" defense strategy of "letting everything out" so that Sandoval couldn't lose credibility. *Id.* at *4. On appeal, Sandoval also raised ineffective assistance of counsel claims, but the Tenth Circuit expressly left those claims to be addressed in the first instance in a § 2255 proceeding such as this one. *Id.*

## II.  Analysis – Preliminary Issues

### *Timeliness of Petition*

The United States argued in its initial response that this action is untimely because it was filed on October 7, 1998 and that the applicable one-year limitations period began to run on October 2, 1997, the date the Tenth Circuit affirmed Sandoval's conviction. Under recent Tenth Circuit decisions, however, a conviction does not become final until after the ninety-day period within which Sandoval could have petitioned the United States Supreme Court for certiorari. *E.g., United States v. Burch,* 202 F.3d 1274 (10th Cir. 2000). Therefore, Sandoval's petition was timely because it was filed within one year of December 31, 1997.

### *Evidentiary Matters*

At the evidentiary hearing in this matter, Defendant's mother, Ruth Sandoval, testified that Tammy Martinez had contacted her twice after trial. Ms Sandoval related that during the first encounter, Ms. Martinez told her that Sandoval and her brother had used plastic guns during the

8

robberies and gave one of them to her for safekeeping. Defendant's mother then had Ms. Martinez talk with Mr. Foster's investigator, a Mr. Rodriguez, who taped Ms. Martinez' statement. The tape was later lost. *TR* at 105, 113-114. Mrs. Sandoval brought to the hearing a toy gun, which she identified and was received into evidence as Exhibit B. *Id.* at 119.

Ms. Sandoval's direct testimony was vague on when this first encounter occurred. On cross-examination, however, she clarified that Ms. Martinez gave her the toy gun in January or February of 1998, well after the appeal was decided. On cross-examination she also conceded that the black-painted toy gun she brought to the hearing is not made of plastic. *Id.* at 121. Indeed, I have viewed the exhibit. Although it is a toy gun, it is heavy and made of metal.

Mrs. Sandoval testified that her second encounter with Ms. Martinez occurred in September 1998, within weeks after Ms. Martinez moved to California. This time, Ms. Martinez indicated that because the "Rodriguez tape" had been lost, she wanted to make a statement for Sandoval to refute her brother's contention that real guns were used in the robberies. *Id.* at 101, 103-104. Therefore, Ms. Martinez wrote a statement on September 29, 1998 and it was notarized the same day. *Id.* at 107-110. The statement provides:

> I Tammy Martinez accompanied Fernandez Sandoval to Walmart. While shopping we bought 2 plastic guns and when we got home we painted them to look real. Any ways I have read the papers from court. I have one thing to say and is true that there is no way they had real guns because its not allowed in the house and I also think that who ever tried to make my brother . . . say its real is going to far. I wanted to go to court but my family told me to stay out of it because of my son. Im not going against any one but I know for sure that they should not have been charged for guns that weren't real. I swear that all this information is true.

*Doc. 1, Exh. A.* Ms. Martinez mailed the statement to Sandoval at his prison on September 29,

1998 by ordinary stamped mail.  *TR* at 111.  Sandoval attached her statement to his *pro se* § 2255 motion, which he claims he mailed to the Court on September 30, 1998.  The motion was filed October 7, 1998.  *Doc. 1.*

Sandoval contends that the record should be expanded under Habeas Rule 7 to include Ms. Martinez' affidavit.  The United States did not object, provided it could submit Agent Macaluso's pre-trial interview report as well as an affidavit from counsel concerning the ineffectiveness claims.  At the evidentiary hearing, Judge Galvan noted that if Ms. Martinez' affidavit is considered part of the record then so would Agent Macaluso's report.  *TR* at 136.

Habeas Rule 4 clearly contemplates that exhibits may be attached to a motion and are to be considered by the Court in its preliminary consideration.  Habeas Rule 7(a) further permits further expansion of the record to include "additional material relevant to the determination of the merits of the petition."  Habeas Rule 7(b) specifically does not limit the type of information materials that can be considered:

> The expanded record may include, without limitation, letters predating the filing of the motion in the district court, documents, exhibits, and answers under oath, if so directed, to written interrogatories propounded by the judge.  Affidavits may be submitted and considered as a part of the record.

Ms. Martinez' notarized statement is relevant to Sandoval's ineffective assistance of counsel claim as is her statement to Agent Macaluso.  Accordingly, these two exhibits as well as the other exhibits attached to the pleadings and introduced at the evidentiary hearing are part of the habeas record considered here.

### III.  Analysis – Ineffective Assistance of Counsel

The two-prong test announced in *Strickland v. Washington,* 466 U.S. 668 (1984) governs

ineffective assistance of counsel claims. *E.g., Mayes v. Gibson,* 210 F.3d 1284 (10th Cir.), *cert. denied,* 121 S. Ct. 586 (2000).[4]  Although Sandoval has withdrawn or abandoned certain claims,[5] the four remaining assertions of ineffectiveness as briefed by the Federal Public Defender are that Mr. Jaramillo was ineffective in:  failing to sever the felon-in-possession count from the armed robbery counts; failing to interview Ms. Martinez; raising Sandoval's prior convictions and illegal conduct in opening statement instead of entering a stipulation; and failing to object to the parole officer's testimony concerning prior convictions.

### *Counsel's Conduct Was Not Deficient*

Sandoval must first show that counsel's representation was "objectively unreasonable."

---

[4] An ineffective assistance of counsel claim fails if either of the *Strickland* prongs are not met.  It is entirely appropriate for a habeas court to analyze the prejudice prong first and exclusively, if that is the easier course.  *E.g., Scoggin v. Kaiser,* 186 F.3d 1203, 1207 (10th Cir.), *cert. denied,* 528 U.S. 953 (1999); *Cooks v. Ward,* 165 F.3d 1283, 1292-1293 (10th Cir. 1998), *cert. denied,* 528 U.S. 834 (1999).

[5] At the evidentiary hearing before Judge Galvan, Sandoval expressly withdrew a prosecutorial misconduct claim based on the panel's decision in *United States v. Singleton,* 144 F.3d 1343 (10th Cir. 1998).  The panel's original decision in *Singleton,* was withdrawn on July 10, 1998, pending rehearing *en banc. See Doc. 7* at 23.  The Tenth Circuit *en banc* held that 18 U.S.C. § 201(c)(2) does not prohibit federal prosecutors from offering a co-defendant a lenient plea agreement in exchange for testimony.  *See United States v. Singleton,* 165 F.3d 1297, 1302 (10th Cir.) (*en banc*), *cert. denied,* 527 U.S. 1024 (1999).
   One assertion of ineffectiveness was based on the *Singleton* argument.  *See Doc. 1 at 9.* The Federal Public Defender did not indicate at the evidentiary hearing that he was withdrawing that claim.  Nevertheless, the claim has not briefed in subsequent pleadings; I therefore find that it has also been withdrawn and, alternatively, without merit.  *See United States v. Fria Vazquez Del Mercado,* 223 F.3d 1213, 1214 (10th Cir.) (due process does not prohibit introduction of testimony given in exchange for plea), *cert. denied,* 121 S. Ct. 600 (2000).
   Finally, in his *pro se* motion, Sandoval argued that counsel should have asked the government in advance of trial whether it intended to produce evidence of his other crimes.  The Federal Public Defender does not raise argue this issue in its brief.  Moreover, the United States notes that it did give Mr. Jaramillo notice well in advance of trial pursuant to the Court's standard pretrial order.  Thus, I find this argument both withdrawn and without merit.

11

*E.g., Clayton v. Gibson,* 199 F.3d 1162, 1177 (10th Cir. 1999), *cert. denied,* 121 S. Ct. 100 (2000).  In doing so, he must overcome the "strong presumption" that counsel's conduct falls within the "wide range" of conduct that is considered to be trial strategy and is deemed "reasonable professional assistance."  To be constitutionally ineffective, counsel's conduct "must have been completely unreasonable, not merely wrong."  *Moore v. Gibson,* 195 F.3d 1152, 1178 (10th Cir. 1999), *cert. denied,* 120 S. Ct. 2206 (2000); *see also Hawkins v. Hannigan,* 185 F.3d 1146, 1152 (10th Cir. 1999).

The decision whether to sever counts is left to the discretion of the trial judge.  *E.g., United States v. Valentine,* 706 F.2d 282, 289 (10th Cir. 1983).  A defendant must make a "strong showing" of prejudice," *id.,* and that this prejudice "outweigh[s] the expense and inconvenience of separate trials," *United States v. Martin,* 18 F.3d 1515, 1518 (10th Cir.), *cert. denied,* 513 U.S. 868 (1994).  "[T]he mere fact that a defendant may have a better chance for acquittal by separate trials of charges is not sufficient to require severance."  *Valentine,* 706 F.2 at 289 (citing *United States v. Strand,* 617 F.2d 571, 575 (10th Cir.), *cert. denied,* 449 U.S. 841 (1980)).  Furthermore, "'[t]he reasonableness of [Mr. Jaramillo's] actions may be determined or substantially influenced by [Sandoval's] own statements or actions.'"  *Duvall v. Reynolds,* 139 F.3d 768, 777 (10th Cir.) (quoting *Strickland*, 446 U.S. at 691), *cert. denied,* 525 U.S. 933 (1998).  Mr. Jaramillo's actions must be viewed from his perspective at the time he made the decisions and in the context in which he made them, not on "'the distorting effects of hindsight.'"  *Id.*

Here, from the time he entered the case until just before trial, Mr. Jaramillo was operating under the assumption that Sandoval maintained his innocence.  Mr. Jaramillo testified that he did not move to sever the felon-in-possession count from the armed robbery counts because:  when

12

he took over the case the time had run for filing such motions; while his predecessor filed a number of motions he did not file one to sever; and, most importantly, there was no dispute that the gun was acquired after the robberies, so the counts were easily distinguishable.

Had Sandoval gone to trial on his innocence/alibi defense, the fact of prior convictions could have been handled with stipulations and instructions. Indeed, the trial court did instruct the jury to consider "'[e]ach charge and the evidence pertaining to it . . . separately.'" *Doc. 28* (quoting trial transcript).

Until four days before trial, Sandoval continally denied that he had participated in the bank robberies. Until his recantation, therefore, there was no "strong showing of prejudice"that would have warranted a severance motion. With Sandoval's admission of guilt to his attorney, the defense focus shifted to exploring a negotiated resolution. Yet it was Sandoval's last minute revelation as to the use of toy guns that obliterated the defense's opportunity to reduce his sentence through a plea bargain. Against this ever-shifting background, counsel's defense strategy necessarily changed as well. Counsel's decision not to seek a severance under all of these circumstances was not unreasonable.

His client's newest version of events implicated the need for further investigation and Mr. Jaramillo successfully requested a continuance for that purpose. "The duty to investigate derives from an attorney's basic function, which is 'to make the adversarial testing process work in the particular case.'" *Duvall,* 139 F.3d at 777 (quoting *Strickland*, 446 U.S. at 690). "'[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Kimmelman v. Morrison,* 477 U.S. 365, 384 (1086) (quoting *Strickland,* 466 U.S. at 691).

13

Mr. Jaramillo testified that he did not know where to locate Ms. Martinez to question her regarding her knowledge of the guns' authenticity. Sandoval provided him with virtually no information as to the name and whereabouts of the other unidentified male. Mr. Jaramillo did speak with co-defendant Gerold, who specifically contradicted Sandoval's story and would testify that both used real firearms in the robberies. Thus, counsel's investigative efforts did not provide corroborating evidence for his client's version of events.

Counsel, however, did have the testimony of some of the government witnesses who believed the guns used in the robberies were fake. This basis for raising doubt on the § 924 charges could be buttressed by mentioning the obvious – witnesses who thought they had observed reals guns made that assessment in stressful circumstances under which the use of a real firearm could be expected. The issue of veracity of Gerald's testimony is equally obvious – he participated in the robberies and was testifying for the government after a plea.

Sandoval ignores that any testimony given by Ms. Martinez likewise would have been obviously suspect. Her past close relationship with Sandoval and her prior statement to Macaluso would have provided fertile grounds for impeachment and recent fabrication. Thus, Ms. Martinez' testimony could have undermined the very theory counsel was pursuing. Even if her testimony could have been of assistance to the defense, it is not a foregone conclusion that she would have agreed to testify anyway. Sandoval cautioned his attorney that Ms. Martinez' family would seek to prevent her from testifying. Under these circumstances, it was reasonable for Mr. Jaramillo to not to seek a further continuance to find her. *See Duvall,* 139 F.3d at 777 ("an attorney is not required to investigate all leads as long as the decision not to pursue a particular lead, or to pursue a particular lead only so far, is reasonable under the circumstances") (internal

14

citations and quotations omitted).

Counsel's strategy was to use the doubt introduced by the government's witnesses and to build on that doubt with candor. I cannot say that his strategy was unreasonable. To the contrary, he was fulfilling his constitutional duty "to make the adversarial testing process work." *See e.g., United States v. Jackson*, 983 F.2d 757, 761 (7th Cir. 1993) ("Although it is true that the defense attorney informed the jury during his opening statement of [defendant's] prior conviction, this does not indicate incompetence. This was simply a strategic decision to preempt the prosecutor's inevitable questions to [defendant] about his prior conviction when he took the witness stand."). Moreover, entering into a stipulation regarding the prior convictions, challenging the parole officer's statements and moving to sever the felon-in-possession count could have been seen as inconsistent with and damaging to that defense. Therefore, I find that counsel's conduct was not deficient.

### *Sandoval Also Fails To Establish Prejudice*

To succeed on an ineffective assistance of counsel claim, Sandoval must also establish "prejudice" – that is, absent counsel's errors, there is a "reasonable probability" that the outcome of the trial would have been different. *Moore,* 195 F.3d at 1178. "Reasonable probability" means that confidence in the outcome is undermined. *Foster v. Ward,* 182 F.3d 1177, 1185 (10th Cir. 1999), *cert. denied,* 529 U.S. 1027 (2000). Having reviewed the record as a whole, I am left with no such belief.

Wherefore,

**IT IS HEREBY RECOMMENDED** that Sandoval's § 2255 motion be denied.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the ten day period  if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

                                                                     _____
                                                                     UNITED STATES MAGISTRATE JUDGE